## IN THE U.S. DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

DEFINITIVE LOGIC CORPORATION,
4600 Fairfax Drive
Arlington, VA 22203

        Plaintiff,

  v.

EDWARD TYLER RODICHOK,
1028 S Walter Reed Drive Apt 204,
Arlington, VA 22204

      and

DELOITTE CONSULTING LLP
1919 North Lynn Street
Arlington, VA 22209

       Defendants.

Case No. 1:21-cv-195

## COMPLAINT
### (Jury Demand)

Plaintiff Definitive Logic Corporation ("Definitive Logic" or "the Company"), by its undersigned counsel, for its complaint against Edward Tyler Rodichok ("Rodichok") and Deloitte Consulting LLP ("Deloitte"), upon knowledge as to itself and its conduct, alleges as follows:

### NATURE OF THE CLAIMS

1. This is an action for misappropriation of trade secrets, breach of contract, and tortious interference with contract that seeks damages and injunctive relief against Rodichok, a former employee of Definitive Logic, and Deloitte, Rodichok's current employer.

2. This action arises out of Rodichok and Deloitte's intentional scheme to breach Rodichok's Employment Agreement with Definitive Logic, steal Definitive Logic's confidential

business information and trade secrets, and wrongfully utilize that stolen data to solicit Definitive Logic's actual and potential customers.

3.      Rodichok and Deloitte's brazen misconduct has caused Definitive Logic substantial damages and harm.  Definitive Logic seeks to recover those damages, including all reasonable attorneys' fees, as well as a disgorgement of all of Rodichok and Deloitte's improper gains, and to permanently enjoin Rodichok and Deloitte from continuing to use Definitive Logic's proprietary information and trade secrets, and from continuing to violate Definitive Logic's contractual and intellectual property rights.

## **PARTIES**

4.      Plaintiff Definitive Logic is a small business with a principal place of business in Arlington, Virginia.

(a)     Definitive Logic engages in the sale, configuration, and implementation of Corporate Performance Management ("CPM") technologies and solutions.  A core competency of Definitive Logic is the development, implementation, and licensing of proprietary, software-based CPM solutions for Financial Planning and Analysis ("FP&A").  Definitive Logic's CPM FP&A software-based solutions focus on the federal government and are market-leading configurations used by government agencies for an agency's financial planning, budgeting, and analysis activities, including the management of agencies' internal Planning, Programming, Budget, and Execution ("PPBE") processes and activities.

(b)     Most, if not all, federal government agencies engage in PPBE processes.  PPBE processes are focused on the full lifecycle of federal resource

management, starting with the strategic plan and continuing through the formulation of the budget, the management of execution of the budget, and the measurement of agency performance. Examples of tasks and activities that are part of PPBE processes include budget formulation, justification, execution, and control. Federal agencies use PPBE processes to determine agency resources and to align the agency's fiscal budget with national strategic guidance and the agency's own mission, policy, strategy, and goals.

(c)    Definitive Logic sells different applications and configurations that are uniquely designed for use by federal government agencies in their PPBE activities, including the Definitive Logic OneStream PPBE and Budget Book Solution (frequently referred to simply as the "PPBE Solution"), and the "Definitive Logic PPBE OneNumber" system, implemented for the Department of Homeland Security ("DHS"). Definitive Logic's PPBE Solution provides an application that allows a federal agency to execute a full lifecycle of programming, budget formulation, budget execution, and performance management processes using a third party CPM solution, in this case OneStream XF software platform. Some, but not all, of Definitive Logic's CPM Financial Planning and Analysis solutions tailored for federal agency PPBE processes are built on the proprietary, third party OneStream XF platform. Definitive Logic was the first company to introduce OneStream XF to the federal market and, on information and belief, to this day Definitive Logic supports every federal implementation of PPBE solutions using the OneStream XF platform.

(d)    The OneStream XF platform is an open configuration software platform with a toolbox.  That is, the OneStream XF platform is a generic and general Financial Planning and Analysis set of software tools that can be used to create tailored and unique software-based solutions like those developed by Definitive Logic. OneStream, and most if not all CPM solutions, have limited inherent business functionality "out of the box."  Out of the box functionality for software means features or functionality of a software product that works immediately without any special installation, configuration, or modification. Out of the box, and without highly technical modification or configuration, the OneStream XF platform is unusable as a sophisticated federal government PPBE application or software.  For example, out of the box, OneStream XF's default application (that is, the "Blank Application") contains only 756 lines of usable xml code.  This Blank Application has no configured business process (data model or workflow), no inherent business logic (business rules), no input objects (forms) to capture or output objects (reports) to display results of the data in a data model.  The Blank Application has no dashboards.  All objects, all dashboards, and all components that comprise the objects and dashboards are created and developed "from scratch" (that is, configured) by a systems integrator like Definitive Logic.  The Definitive Logic's PPBE Solution at the heart of this Complaint contained approximately 1,059,682 lines of code developed and configured by the Company.

5.     Defendant Rodichok is a resident of Arlington, Virginia.  Rodichok worked for Definitive Logic in its Arlington office from November 2016 until January 2020.  Rodichok is currently employed by Deloitte in its Arlington, Virginia office.

6.     Defendant Deloitte is a multinational professional services firm that provides audit, tax, advisory, and consulting services to commercial and federal government agency clients. Deloitte operates offices in many different locations around the world, including but not limited to an office in Arlington, Virginia.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Count I arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  This Court has supplemental jurisdiction over the remaining causes of action because they are so related to Count I that they form part of the same case or controversy under Article III of the U.S. Constitution.  *See* 28 U.S.C. § 1367.

8.     Personal jurisdiction is proper because both defendants reside in and regularly transact business in this District.

9.     Venue is proper in this Court under 28 U.S.C. § 1391 because Rodichok resides in this judicial district and/or because Rodichok and Deloitte are subject to this Court's personal jurisdiction in this action.

## BACKGROUND

A.     **Rodichok's Employment With Definitive Logic**

10.     On or about October 27, 2016, Rodichok began full-time employment with Definitive Logic as a developer in the company's Financial Management Practice.  Rodichok's responsibilities concerned, in large part, working on Definitive Logic's proprietary CPM Financial Planning and Analysis software solutions, including Definitive Logic's software configurations

and implementations of the OneStream XF platform into the unique Definitive Logic PPBE software products, which were then licensed to and implemented for Definitive Logic's federal agency clients.

11.     As an essential part of his duties as an employee of Definitive Logic, Rodichok was required to, and did, develop and create valuable trade secrets for Definitive Logic, including the unique Definitive Logic inputs and configurations of the OneStream XF platform so that it would operate as an efficient and highly featured Financial Planning and Analysis solution for federal government agencies' PPBE processes.

12.     Rodichok's responsibilities on behalf of the Company also included extensive marketing and client development efforts, both of existing Definitive Logic clients and potential prospects.

13.     Rodichok received an initial annual base salary of $100,000.  As of the date of his departure from Definitive Logic, Rodichok's annual base salary was $145,000 and he received $13,000 in additional performance bonuses over his final year.

14.     Prior to his first day of work, Rodichok signed an Employment Agreement for New Employees ("Employment Agreement") that governed the relationship between Rodichok and the Company.  Because of Rodichok's roles at the Company, and because of the highly competitive market within which Definitive Logic operates, the Employment Agreement contained post-employment restrictions in the event that Rodichok left his job with Definitive Logic.

15.     First, Rodichok agreed that in the event he terminated his employment he would not directly compete with Definitive Logic clients or potential clients for 12 months:

> 1. NON-COMPETITION: Employee acknowledges that Definitive Logic operates in a highly competitive industry and that it has a legitimate business interest in protecting its good will and client relationships.  Employee further acknowledges that employment

with Definitive Logic will bring Employee into personal contact with Definitive Logic's clients and potential clients, so that Employee will know their names and requirements, and such employment also will give Employee valuable information about Definitive Logic's business. In recognition of this and in consideration of the employment provided to Employee by Definitive Logic, Employee agrees that during employment with Definitive Logic and for a period of twelve (12) months after termination of employment with Definitive Logic, whether voluntary or involuntary and with or without cause, Employee shall not solicit or perform work or services in competition with Definitive Logic's business on behalf of any Definitive Logic client that Employee provided services for directly, or indirectly, through employees working under Employee, that Employee had communications or business dealings with, or for which Employee was responsible, for the period twenty-four (24) months prior to the termination of employment with Definitive Logic.

16.     Rodichok also agreed that he would not solicit, whether directly or indirectly, any

Definitive Logic client with which he worked:

2. NON-SOLICITATION: Employee further agrees that during employment with Definitive Logic and for a period of twelve months after termination of employment with Definitive Logic, whether voluntary or involuntary and with or without cause, Employee shall not, directly or indirectly: (a) solicit the business of any Definitive Logic client that Employee provided services for directly, or indirectly through employees working under Employee, that Employee had communications or business dealings with, or for which Employee was responsible, for the period twenty-four (24) months prior to termination of employment with Definitive Logic, and who was a client or prospective client of Definitive Logic during such 24-month period ("Designated Clients"); (b) persuade or attempt to persuade any Designated Clients to discontinue or alter a business relationship with Definitive Logic; (c) solicit for a competitive purpose or interfere with Definitive Logic's relationship with any Designated Clients; or (d) solicit, hire or offer to hire any employee, officer, or agent of Definitive Logic while such person is employed by Definitive Logic and for twelve (12) months after the termination of that person's employment with Definitive Logic, nor will Employee induce any such employee officer or agent to discontinue his or her relationship with Definitive Logic while this Agreement is in effect and for twelve (12) months after Employee's termination of employment with Definitive Logic.

17.     Finally, Rodichok also promised to refrain from taking and/or using any of Definitive Logic's Confidential Business Information following his employment.   Rodichok's Employment Agreement broadly defined Confidential Business Information:

> 3. CONFIDENTIALITY: As used in this Agreement, "Confidential Business Information" shall mean all information related to the business or affairs of Definitive Logic, including, but not limited to, information related to: Definitive Logic clients or prospective clients, including requirements; contracts; pricing and estimates; marketing; business strategies; profit margins or other proprietary information used by Definitive Logic; and any information related to Definitive Logic's; business that is a trade secret within the meaning of the Virginia Uniform Trade Secrets Act. Employee waives any requirement that Definitive Logic submit proof of the economic value of any trade secret or post a bond or other security. Employee acknowledges that such Confidential Business Information is vital sensitive, confidential and proprietary to Definitive Logic, and that this provision is reasonable and necessary to the protection of Definitive Logic's legitimate business interests.
>
> In consideration of the employment provided to Employee by Definitive Logic, Employee agrees not to use for Employee's own purpose nor disclose to any third parties such Confidential Business Information either during or subsequent to [his] employment with Definitive Logic, unless authorized or requested to do so by Definitive Logic in writing or by law. None of the foregoing obligations and restrictions apply to any Confidential Business Information that Employee can prove was or became generally available to the public other than as a result of use or disclosure by Employee.

18.     After signing the Employment Agreement on October 18, 2016, and completing the onboarding process, Rodichok became a full-time employee of Definitive Logic.   While an employee, Rodichok was directly and substantially involved in soliciting work and services for many of the Company's federal government agency clients.

**B.     The Development of Definitive Logic's PPBE Federal Budget Formulation Solution**

19.     In 2018, Definitive Logic began to develop a CPM FP&A software solution using OneStream XF that provided enhanced tools to support the full lifecycle of agency PPBE

requirements.  Definitive Logic called this software-based solution its OneStream PPBE and Budget Book Solution (the "PPBE Solution").  The PPBE Solution was the first in the marketplace to present discrete budget changes and programmatic out-year profiles for federal government agency budget administrators in a single platform.  The Company's PPBE Solution permitted agencies, in one activity, to identify the discreet budget changes that will be entered into their budget book along with program analysis and evaluation views of the overall requirement into the out-years—streamlining their budget planning and making their budget development more visible and efficient.  It also allowed them to organize those inputs into Congressional Budget Justification ("CBJ") books in a single contiguous workstream, streamlining operational efficiency.

20.     Definitive Logic's PPBE Solution is a highly sophisticated configuration of the OneStream XF platform.  The OneStream XF platform itself is a set of generic Financial Planning and Analysis software tools that can be used to create tailored and unique software-based solutions like those developed by Definitive Logic.  On its own, OneStream XF is unusable as a federal government PPBE application or software, and requires a sophisticated implementer to design and configure a unique solution to take any advantage of the product's capabilities.

21.     Out of the box, OneStream XF's default application contains only 756 lines of usable xml code. The Definitive Logic's PPBE Solution at the heart of this Complaint contained approximately 1,059,682 lines of code developed by the Company.

22.     To develop a PPBE configuration like Definitive Logic's, a software implementer is required to have advanced knowledge of federal budget processes and expertise in the architecture and configuration of the commercial software product platform (e.g., OneStream) to create a customized configuration of the tools and functions the client requires or desires.

23.     Definitive Logic developed nearly two dozen bespoke tools and features to make a functioning PPBE Solution it could market to clients.  These tools and features, some with multiple sub-features, each represent unique design and concepts, logic, proprietary software formulas, processes, techniques, coding, methods, tables, fields and technical components.  Definitive Logic's trade secrets are these unique design and concepts and the unique software, formulas, processes, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data.  Examples of these features include specific account identifiers, specific tables, table columns, codes and methodologies including, but not limited to:

(a)     Appropriation Data Inputs and Budget/Profile Calculations:  The solution provides a highly advanced configuration that supports both the identification of budget changes and the impact with inflation of the budget change requirement to the out-year profile.  This calculation takes funding inputs and splits them out into components providing a separation and auditing of data entered versus data calculated.  This unique feature includes technical components such as a bespoke business rule with 1417 lines of VB.Net code; 17 cube view form inputs or reports; 5 Data Management Sequences; 6 Data Management Steps; 20 Dashboards; and 9 Dashboard Groups.

(b)     Decision Analysis, Review & Checkbook: This feature provides for funding, FTE, and Positions to be switched on and off to add to a running total and to balance to fiscal guidance.  The method is to store a flag on each budget change and then to copy those inputs to another scenario in the process of completing each iteration of the calculation.  The feature includes technical components including a unique business rule with 251 lines of code; 6 dashboards; 2 dashboard groups; and 4 cube views.

24.     The PPBE Solution's tools and features include numerous Data Models, which are based on a set of data elements and hierarchies.  These models are used to fit the software into the form required for the Solution.  While any configuration would use Data Models, each one is developed from scratch by a software implementer like Definitive Logic and is unique to the implementer or integrator.

25.     In addition, Definitive Logic developed a unique methodology to capture inputs from the user of the PPBE Solution, in order to run the calculations and reporting processes that the PPBE Solution can perform.  Each software implementer configuring a PPBE Solution must identify and develop a unique method of capturing inputs in order to make the Solution operate.

26.     Finally, these features include myriad logic-based business rules to support the technical processes that underlie the PPBE Solution. These rules consist of new code written by the company implementing the solution.  In its PPBE Solution, Definitive Logic wrote over three hundred lines of unique code to support a single calculation, with thousands of lines per full PPBE Solution.

27.     The PPBE Solution project took nearly a year and a half to complete, and over 8,000 man-hours to execute.  The Company made the initial investment in its PPBE Solution in March 2018 to support a bespoke configuration for DHS.

28.     After this initial implementation, Definitive Logic continued to develop its PPBE Solution and market it to multiple customers.  The Company has invested over $1 million in this subsequent development.

29.     Over time, the PPBE Solution emerged as a cornerstone of Definitive Logic's business.  It served as the basis for at least nine contracts for government agencies between 2018 and 2020, generating over $20 million in revenue.  Through additional development, Definitive Logic is marketing the PPBE Solution for future contracts valued at nearly $100 million.

30.     While portions of the PPBE Solution are customer-facing, Definitive Logic recognized the value of its methodology and PPBE Solution and so ensured that the underlying calculations, code, and data were not disclosed publicly.  These data constituted the Company's Confidential Business Information and trade secrets.

31.     The Confidential Business Information and trade secrets that comprised the backbone of the PPBE Solution were at all times stored on secure, password-protected networks at Definitive Logic or federal government agency networks, and not disclosed outside the Company.  Access to Definitive Logic networks and federal agency systems were protected with appropriate network information security and user/group/role permissions, and the configuration has remained under Definitive Logic's control as the contractor leading customer configuration efforts.

32.     While at Definitive Logic, Rodichok spent the majority of his time configuring this PPBE Solution for its initial implementation at DHS.  Rodichok was assigned to the development team for this project, and had access to the Confidential Business Information and trade secrets that support the PPBE Solution.

33.     After the initial implementation, Rodichok remained involved in PPBE Solution development and marketed the PPBE Solution to federal government agency clients including, but not limited to, the Treasury Bureau of the Fiscal Service, DHS, the Federal Emergency Management Agency ("FEMA"), and the Department of State.

**C.     After Developing the PPBE Solution at Definitive Logic and Cultivating Client Contacts, Rodichok Was Approached by Deloitte with an Employment Offer**

34.     In late 2019, while he continued to market the PPBE Solution, Rodichok was approached by Deloitte about an opportunity to join Deloitte's Finance & Enterprise Performance Team.

35.     At that time, Deloitte was not implementing any OneStream configurations to federal government agency clients.

36.     Shortly after this initial approach, Rodichok received a formal offer to join Deloitte's Finance & Enterprise Performance Team as a full time employee.

37.     In December 2019, Rodichok told Definitive Logic that he intended to leave his job with the Company and join Deloitte.

**D.      Both Rodichok and Deloitte Were Aware of Rodichok's Post-Employment Restrictions Prior to Rodichok Leaving Definitive Logic**

38.     Rodichok was aware that the obligations of his Employment Agreement would limit his ability to work for Deloitte, particularly with regard to federal government agency customers on technology consulting projects.

39.     Furthermore, prior to joining Deloitte, Rodichok shared his Definitive Logic Employment Agreement with Deloitte to confirm that the scope of his employment would not violate its terms.

40.     Following Deloitte's review, Rodichok told Definitive Logic employee Ed Cody, his line manager at Definitive Logic, that both Rodichok and Deloitte were aware of Rodichok's post-employment restrictions and that his work with Deloitte would not violate the terms of the Employment Agreement.

**E.      Before Moving to Deloitte, Rodichok Stole Extensive Confidential Business Information and Trade Secrets That Belonged to Definitive Logic**

41.     Unbeknownst to Definitive Logic, however, Rodichok had already begun copying the Company's Confidential Business Information and trade secrets and intended to use them in his new position at Deloitte.

42.     In December 2019, after deciding to leave Definitive Logic for Deloitte, and without the Company's authorization, Rodichok utilized his Definitive Logic network password, accessed a Definitive Logic computer asset, and collected substantial amounts of highly sensitive Company Confidential Business Information and trade secrets, which he then saved on an external hard drive.

43.     The stolen information included proprietary documents relating to the PPBE Solution, including a copy of the configuration with the underlying calculations, methodologies, and other data that the Company had sought to protect.

44.     Rodichok took this material with the intent to use it at his new employer, Deloitte.

**F.     After Leaving Definitive Logic, Rodichok Started Working for Deloitte in Direct Violation of His Employment Agreement**

45.     In January 2020, following his departure from Definitive Logic, Rodichok joined Deloitte as a Manager on its Enterprise Performance Team.

46.     Despite his assurances to Definitive Logic that his employment would not violate his Employment Agreement, Rodichok soon solicited the same federal customers with whom he worked at Definitive Logic.

47.     Moreover, on arrival at Deloitte Rodichok began utilizing the stolen Definitive Logic Confidential Business Information, including the Company's trade secrets, to develop solutions and solicit federal government agency customers.

48.     Despite being aware of his post-employment restrictions, Deloitte encouraged Rodichok's actions.

49.     Deloitte, using information provided by Rodichok including personnel rosters and cell phone numbers, also recruited and solicited Definitive Logic employees of Rodichok's own team and those he managed.

**G.     Rodichok and Deloitte Used Stolen Definitive Logic Trade Secrets to Market the Company's PPBE Solution as Their Own**

50.     Definitive Logic did not learn of Rodichok's theft and the violations of his Employment Agreement until November 2020, when it learned of an October 14, 2020 webinar that Deloitte and Rodichok developed, which had been posted on OneStream's Website.  The

Deloitte presentation featured a Deloitte configuration of Definitive Logic's PPBE Solution. Deloitte's presentation was based on the data Rodichok stole from Definitive Logic.

51.     The Deloitte webinar's configuration showed extensive calculations and data lifted directly from the Definitive Logic's PPBE Solution that were not released or disclosed publicly and that continue to be protected by the Company.

52.     Many of the demonstration screens showing Deloitte's alleged "new" configuration are identical or nearly identical to the demonstrations Definitive Logic uses to display its PPBE Solution.  The Deloitte webinar makes clear that Deloitte's alleged "bespoke" solutions were merely copies of the components that made up Definitive Logic's PPBE Solution.

53.     Other demonstration screens were superficially altered or reconfigured to mislead the viewer into thinking that Deloitte had developed the solution itself.

54.     The October 14, 2020 Deloitte webinar was directed at a wide variety of federal government agency customers and then made publicly available.

55.     In addition to featuring its stolen PPBE Solution in the October 14 Deloitte webinar, Deloitte and Rodichok highlighted multiple additional OneStream configurations that they intended to launch in the federal government sector in the future.  These configurations were also based on the stolen Definitive Logic Confidential Business Information and trade secrets.  The stolen configurations included Financial Statement Solutions, Performance Management Solutions, and Spending Plan Solutions.  Each of the highlighted OneStream configurations—which Deloitte purported to offer despite not having any OneStream federal configuration products—are all based on Definitive Logic's proprietary information that Rodichok stole.

56.     Deloitte, with Rodichok's assistance, has continued to market the stolen PPBE Solution to federal government agency customers, including FEMA and other agencies that Rodichok directly engaged with during his time at Definitive Logic.

**H.     Deloitte and Rodichok Failed to Cease and Desist From Violating Definitive Logic's Rights**

57.     On December 22, 2020, Definitive Logic sent Cease and Desist Letters to Deloitte and Rodichok demanding that they cease violating or encouraging the violation of the Employment Agreement; that they return or destroy any and all data and documents that belong to or were copied or misappropriated from Definitive Logic; and that they certify they will not use such data and documents in the future.

58.     Both Deloitte and Rodichok agreed to the terms of the letters pending Deloitte's investigation into the allegations raised in Definitive Logic's letters.

59.     Negotiations continued throughout January and February 2021; however, defendants were unwilling to resolve the matter.

## CAUSES OF ACTION

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER FEDERAL LAW
**Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.***
**(Against Both Defendants)**

60.     Definitive Logic incorporates by reference each of the allegations contained in the foregoing paragraphs 1–5 as if fully stated herein.

61.     The data underlying Definitive Logic's PPBE Solution and the associated OneStream configurations, that is, the unique design and concepts and the unique software, formulas, processes, applications, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data, constitute trade secrets over which Definitive Logic affirmatively and diligently has taken steps to maintain confidentiality.

62.     The trade secrets misappropriated by Deloitte and Rodichok relate to products and services used and intended for use in interstate commerce.

63.     Definitive Logic's trade secrets have independent economic value because they are not generally known and are not readily ascertainable through proper means.  Definitive Logic has spent significant time and devoted substantial resources to developing this information, and through it, Definitive Logic is able to operate and grow its business in a way that is difficult for its competitors to duplicate.  Definitive Logic has taken reasonable measures to keep this confidential information secret, including by securing the data on its networks.

64.     Rodichok knowingly acquired such trade secrets as a result of his unauthorized copying of Definitive Logic's data when he left the Company.

65.     Rodichok utilized these trade secrets in his new employment with Deloitte by relying on them to build Deloitte's own version of a PPBE Solution and marketing that solution to federal government agency customers.

66.     Rodichok and Deloitte's knowing appropriation and use of the trade secrets described above constituted a misappropriation of Definitive Logic's trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

67.     Rodichok and Deloitte deliberately misappropriated Definitive Logic's trade secrets with the intent to use that information for their own benefit and to unfairly compete against the Company.  Their misappropriations were thus willful and malicious.

68.     As a result of their improper misappropriations, Rodichok and Deloitte have not only caused substantial harm to Definitive Logic, but have unjustly enriched themselves.

69.     The Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate or foreign commerce.

70.     By reason of Rodichok and Deloitte's misappropriations, Definitive Logic is entitled to recover monetary damages in an amount to be determined at trial for Rodichok and Deloitte's unjust enrichment and Definitive Logic's actual losses, as well as punitive and exemplary damages, and to recover attorneys' fees.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER STATE LAW
**Virginia Uniform Trade Secrets Act, VA. CODE ANN. § 59.1-336, *et seq.***
**(Against Both Defendants)**

71.     Definitive Logic incorporates by reference each of the allegations contained in the foregoing paragraphs 1–59 as if fully stated herein.

72.     The data underlying Definitive Logic's PPBE Solution and the associated OneStream configurations, that is, the unique design and concepts and the unique software, formulas, processes, programs, tools, techniques, tables, fields, functionality, and logic by which its components interrelate and process data,  constitute trade secrets over which Definitive Logic affirmatively and diligently has taken steps to maintain confidentiality.

73.     The trade secrets have independent economic value because the trade secrets are not generally known and is not readily ascertainable through proper means.  Definitive Logic has spent a significant amount of time and devoted substantial resources to developing this information, and through it Definitive Logic is able to operate and grow its business in a way that is difficult for its competitors to duplicate.  Definitive Logic has taken reasonable measures to keep this confidential information secret, including by securing the data on its networks.

74.     Rodichok knowingly acquired such trade secrets as a result of his unauthorized copying of Definitive Logic's data when he left the Company.

75.     Rodichok utilized these trade secrets in his new employment with Deloitte by relying on them to build Deloitte's own version of a PPBE Solution and marketing that solution to federal government agency customers.

76.     Rodichok and Deloitte's knowing appropriation and use of Definitive Logic's trade secrets constituted a misappropriation under state law, specifically the Virginia Uniform Trade Secrets Act ("VUTSA"), VA. CODE ANN. § 59.1-336, *et seq.*

77.     Rodichok and Deloitte deliberately misappropriated Definitive Logic's trade secrets with the intent to use that information for their own benefit and to unfairly compete against the Company.  Their misappropriations were thus willful and malicious.

78.     As a result of their improper misappropriations, Rodichok and Deloitte have not only caused substantial harm to Definitive Logic, but have unjustly enriched themselves.

79.     The Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate or foreign commerce.

80.     By reason of Rodichok and Deloitte's misappropriations, Definitive Logic is entitled to recover monetary damages in an amount to be determined at trial for Rodichok and Deloitte's unjust enrichment and Definitive Logic's actual losses, as well as punitive and exemplary damages, and to recover attorneys' fees.

**COUNT III – BREACH OF CONTRACT**
**(Against Rodichok)**

81.     Definitive Logic incorporates by reference each of the allegations contained in the foregoing paragraphs 1–59 as if fully stated herein.

82.     Definitive Logic has a valid, binding, and enforceable Employment Agreement with Rodichok.

83.     Definitive Logic has fully, faithfully, and timely performed all obligations under the Employment Agreement.

84.     Rodichok materially breached the terms and conditions of his Employment Agreement by, without limitation:

   a)  Improperly competing with Definitive Logic through his soliciting of Definitive Logic's actual or potential customers while employed with Deloitte;

   b)  Removing and misusing Definitive Logic's Confidential Business Information in the course of his employment with Deloitte and utilizing that information to solicit new business; and

   c)  Soliciting members of his Definitive Logic team to join Deloitte.

85.     As a direct and proximate result of Rodichok's breaches of the Employment Agreement, Definitive Logic has suffered, and will continue to suffer ongoing injury, including substantial economic harm in the form of damage to its relationships with its valued customers, continuing loss of its competitive position, loss of market share, and lost profits.

86.     As a direct and proximate result of Rodichok's breaches of his Employment Agreement, Definitive Logic has incurred costs and attorneys' fees.

87.     Rodichok is an intentional wrongdoer and has been unjustly enriched and continues to be unjustly enriched by his wrongful conduct.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Deloitte)

88.     Definitive Logic incorporates by reference each of the allegations contained in the foregoing paragraphs 1–59 as if fully stated herein.

89.     Definitive Logic had a valid and enforceable Employment Agreement with Rodichok.

90.     At all relevant times, Deloitte was aware that Rodichok had a valid and enforceable Employment Agreement with Definitive Logic.

91.     Deloitte intentionally induced Rodichok to violate provisions and covenants in his Employment Agreements including, without limitation, those set forth in Sections 1, 2 and 3 of the Employment Agreement.

92.     As a result of Deloitte's wrongful inducement, Rodichok did breach provisions and covenants in his Employment Agreement including, without limitation, those set forth in Sections 1 and 3 of that Employment Agreement, by soliciting customers in direct competition with Definitive Logic and using Definitive Logic's Confidential Business Information stolen by Rodichok.

93.     Deloitte's wrongful conduct has caused substantial, ongoing injury to Definitive Logic, including substantial economic harm in the form of damage to its relationships with its valued customers, continuing loss of its competitive position, loss of market share, and lost profits.

94.     Deloitte is an intentional wrongdoer and has been unjustly enriched and continues to be unjustly enriched by its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Definitive Logic respectfully requests that the Court grant the following relief:

(i)     Enter judgment in favor of Definitive Logic and against Rodichok and Deloitte;

(ii)    Order Rodichok and Deloitte to identify and return all confidential material and information belonging to Definitive Logic that is currently in Rodichok or Deloitte's possession, custody, or control;

(iii)   Permanently enjoin Rodichok and Deloitte from any further use of Definitive Logic's Confidential Material, trade secrets, and other confidential information;

(v)      Order Rodichok and Deloitte to disgorge its wrongful gains in an amount to be determined at trial;

(viii)   Enter an order holding Rodichok and Deloitte liable for payment to Definitive Logic of an amount of money damages to be proven at trial;

(x)      Enter an order awarding Definitive Logic punitive damages against Rodichok and Deloitte;

(xi)     Enter an order awarding Definitive Logic all reasonable attorneys' fees, expenses, interest, and costs in connection with this proceeding;

(xii)    Enter an order awarding Definitive Logic its costs and prejudgment interest;

(xiii)   Grant such further and alternative relief as the Court may deem just and appropriate under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 28, Definitive Logic demands a trial by jury on all issues so triable.

Dated:   February 22, 2021                    Respectfully submitted,

J. Andrew Jackson, VSB# 35041
Fernand A. Lavallee, VSB # 29861
Alexander M. Yabroff (*pro hac vice*
forthcoming)
Peter M. Kahnert (*pro hac vice* forthcoming)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
ajackson@jonesday.com
flavallee@jonesday.com
ayabroff@jonesday.com
pkahnert@jonesday.com

*Counsel for Plaintiff*
*Definitive Logic Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2021, I electronically filed the foregoing Complaint with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system. I further certify that, on February 19, 2021, I caused the foregoing document to be sent via electronic mail to:

> Annika Jin-Hendel
> Kendall A. Lucas
> Deloitte
> 1919 N Lynn St
> Arlington, VA, 22209-1742
> kelucas@deloitte.com
> annjin@deloitte.com

> *Counsel for Defendant Deloitte Consulting LLP*

> Jeffrey J. Pargament
> Andrew P. Hallowell
> Pargament & Hallowell PLLC
> 1776 K Street NW, Suite 825
> Washington, DC 20006
> JPargament@pandhlaw.com
> AHallowell@pandhlaw.com

> *Counsel for Edward Tyler Rodichok*

Dated:   February 22, 2021                    Respectfully submitted,

                                              J. Andrew Jackson
                                              VSB# 35041
                                              JONES DAY
                                              51 Louisiana Avenue, N.W.
                                              Washington, D.C. 20001
                                              Telephone: (202) 879-3939
                                              Facsimile: (202) 626-1700

                                              *Counsel for Plaintiff*
                                              *Definitive Logic Corporation*